**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID WHITE, on behalf of himself and all others similarly situated, | |
| Plaintiff, | Case No. _____ |
| v. | |
| DRAFTKINGS, INC., a Delaware corporation, and FANDUEL, INC., a Delaware corporation, | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiff David White ("Plaintiff") alleges the following against DraftKings, Inc. ("DraftKings") and FanDuel, Inc. ("FanDuel") (collectively, "Defendants") upon personal knowledge as to his own transactions and upon information and belief as to all other matters.

**I.      NATURE OF THE CASE**

1.      Plaintiff brings this class action individually and on behalf of a class of persons who play "daily fantasy sports" through websites operated by Defendants DraftKings and FanDuel.  Although Defendants portray themselves as leaders in the business of daily fantasy sports competitions that require skill and strategy, in reality Defendants operate their websites in such a way that only a few players are collecting the vast majority of winnings.  In fact, the games are rigged to favor those that have access to inside information.

2.      Defendants' employees have engaged in conduct akin to insider trading, using statistics amassed by their employers to gain a competitive advantage while participating in

1

competitors' online competitions.  For example, a FanDuel employee can use FanDuel statistics regarding particular NFL players not available to other users.

3.     Defendants' conduct violates the laws of Massachusetts, Florida, and New York, including New York General Business Law § 349, which protects consumers from deceptive acts and practices.  Defendants' unfair, deceptive, and misleading course of conduct has caused damage to Plaintiff and the class.

4.     Defendants' material misrepresentations and omissions fraudulently induced Plaintiff and the proposed classes to give Defendants money, which ultimately went to Defendants and their employees through fees and contest prizes.

## II.    PARTIES

5.     Plaintiff is a citizen of St. Augustine Beach, Florida.  Plaintiff has played daily fantasy sports on both the DraftKings and FanDuel websites.

6.     Defendant DraftKing is a Delaware corporation with its principal place of business in Boston, Massachusetts.  DraftKings describes itself as a "leading provider of daily fantasy sports."

7.     Defendant FanDuel is a Delaware corporation with its principal place of business in New York, New York.  FanDuel describes itself as "the leader in one-day fantasy sports."

## III.    JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(d), because this is a class action in which: (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (2) members of the proposed class are citizens of a State different from a defendant; and (3) the number of Class Members is greater than 100.

9.      Because a substantial portion of the wrongdoing alleged herein occurred in New York, the Court has personal jurisdiction over Defendants. Defendants also have sufficient minimum contacts with New York and have otherwise intentionally availed themselves of the markets in New York through the promotion, marketing, and sale of products sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (3) because: (1) a substantial part of the events or omissions giving rise to these claims occurred in this District, (2) a substantial part of the property that is the subject of this action is situated in this District, and (3) Defendants are subject to the Court's personal jurisdiction with respect to this action.

## IV.   FACTUAL ALLEGATIONS

11.      DraftKings and FanDuel are companies that maintain daily fantasy sports websites that permit individuals to play one-day fantasy sports competitions against other players on the same website.  FanDuel was launched in 2009; DraftKings launched three years later in 2012.

12.      DraftKings' and FanDuel's business models are substantially similar: Fans pay an entry fee to a website – from as little as $0.25 up to $1,000.00 – to play dozens if not hundreds of opponents, with prize pools that can pay as much as $2 million to the winner.  In order to participate in the daily fantasy sports contests, a player on the websites is required to create an account, place money in it, and then use that money to pay entry fees into each game.  At the end of each day, winners of each fantasy sports contest are awarded prize money, which is credited to the players' accounts.

13.     Defendants take a percentage of the total pot in each daily fantasy sports contest as a fee for hosting the game.

14.     Defendants advertise and market their services as games of skill and strategy and therefore avoid gambling industry regulations, including the Unlawful Internet Gambling Enforcement Act.  Both Defendants have spent millions of dollars on advertising to reinforce this message.  A recent DraftKings ad encouraged players to "use your knowledge and showcase your skills."[1]  Similarly, FanDuel runs advertisements urging players to "get paid for [your] knowledge" if you are "smarter than the average fan."[2]

15.     In fact, real world statistics show that the vast majority of winnings in these daily fantasy sports games go to a very small percentage of players, with as few as 1 percent of the players taking home over 90 percent of the prize money.[3]

16.     Defendants' business has thus far generated millions of dollars in profit and allowed the companies to attract millions of dollars in investment.  The two companies have each raised hundreds of millions of dollars of investment capital, and both are now valued at more than $1 billion.

---

[1] *See* DraftKings - "Week 1"  Commercial, *available at* https://www.youtube.com/watch?v=VDa-cDu8KYg (last visited Oct. 9, 2015).

[2] *See* FanDuel Fantasy Football Commercial, *available at* http://www.ispot.tv/ad/AVPC/fanduel-com-one-week-fantasy-football-get-paid-for-knowledge (last visited Oct. 9, 2015).

[3] *See* Sports Business Daily Journal, *available at* http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx (last visited Oct. 9, 2015); *see also* Bloomberg Business, *available at* http://www.bloomberg.com/news/articles/2015-09-10/you-aren-t-good-enough-to-win-money-playing-daily-fantasy-football (last visited Oct 9, 2015).

### A.    Defendants' Scheme Exposed

17.    Daily fantasy sports contests evolved from informal fantasy sports games that have been around for several decades.  Earlier incarnations of these games involved groups of fans playing games against one another for fun over a full season.  Fantasy sports players would assemble hypothetical teams in "drafts," and then compete against each other based on the number of points that their teams collected during actual games.

18.    Fantasy sports games exploded on the Internet in the 1990s, with players gaining ever greater access to statistics and data.  Daily fantasy sports games arose from this Internet explosion, with competitions conducted over a much shorter period of time—a single day or single weekend—than the season-long competitions.  Industry studies estimate that daily games will generate around $2.6 billion in entry fees in 2015 and grow to as much as $14.4 billion by 2020.

19.    Access to data relating to any particular player, and analytics related to particular strategies that could increase a player's chances of winning, are of significant value to anyone competing in a particular competition.  Defendants' employees are at a particular advantage in this regard, as they have ready access to the inside information, including statistics and analysis on how each competition has unfolded.

20.    DraftKings employees have won at least $6 million playing fantasy sports games on FanDuel.  Similarly, FanDuel profiled one of its employees who won $50,000 playing fantasy sports games on other websites.

21.     An employee at DraftKings admitted recently to inadvertently releasing data before the start of the third week of National Football League games.[4] The employee, a mid-level content manager named Ethan Haskell, won $350,000 at a rival site, FanDuel, that same week.

22.     Below is a chart depicting Haskell's success playing major league baseball fantasy games on FanDuel in August of 2015, during a period when he had inside information from DraftKings:[5]

**Ethan Haskell's absurd success playing FanDuel MLB in August 2015**

| | First Cash | Second Cash | Third Cash | Fourth Cash |
|---|---|---|---|---|
| 8/1/2015 | 1st of 1810 in $40K MLB | 6 of 147 in $4 million MLB qualifier | | |
| 8/2/2015 | 28 of 4597 in $100K MLB | 32 of 4597 in $100K MLB | | |
| 8/3/2015 | 7th of 555 in $150K MLB | 4 of 166 in $15K MLB | | |
| 8/4/2015 | 34 of 8045 in $175K MLB | | | |
| 8/5/2015 | 7th of 740 in $200K MLB | 12 of 185 $50K MLB | 3 of 112 in $10K MLB | 60 of 5747 in $125K MLB |
| 8/7/2015 | 10 of 2506 in $4 million MLB qualifier | | | |
| 8/8/2015 | 8 of 102 in $4 million qualifier | | | |
| 8/9/2015 | 11 of 5287 in $115K MLB | | | |
| 8/10/2015 | 1st of 5747 in $125K MLB | 58 AND 86 of 740 in $200K MLB | | |
| 8/11/2015 | 13 of 1059 in $300K MLB | 58 of 7356 in $160K MLB | | |
| 8/12/2015 | 20 of 2667 in $60K MLB | | | |
| 8/18/2015 | 1st of 12889 in 300K MLB | 31 of 12889 in $300K MLB | | |
| 8/20/2015 | 26 of 740 in $300K MLB | | | |
| 8/21/2015 | 3rd of 740 in 200K MLB | 34 of 740 in $200K MLB | 36 of 9195 in $200K grand slam | |
| 8/22/2015 | 54 of 687 in $200K MLB | | | |
| 8/24/2015 | 35 of 1111 in $300K MLB | | | |
| 8/25/2015 | 6 of 1333 in 400K MLB | 30 of 7078 in $160K | | |
| 8/28/2015 | 53 of 1050 in $300K MLB | | | |
| 8/30/2015 | 44 of 4597 in $100K MLB | | | |
| 8/31/2015 | 51 of 2180 in $700K MLB | 115 of 2180 in $700K MLB | | |

larrybrownsports.com

[4] *See* https://rotogrinders.com/threads/draftkings-ownership-leak-850584?page=1#reply-850635.

[5] *See* http://larrybrownsports.com/fantasy/ethan-haskell-draft-kings-fanduel-profile/276741.

23.     FanDuel employee Matt Boccio is ranked by Rotogrinders as one of the Top 50 fantasy sports players.  He acquired this ranking while playing from June 16, 2015 to October 3, 2015, a period of less than four months.

24.     DraftKings founder Paul Liberman admitted that his employees were playing on rival sites in a September 25, 2015 speech at a Babson College conference. "We have some people who make significantly more money off of our competitors' sites than they do working for DraftKings," Liberman told the group.[6]

25.     DraftKings CEO Jason Robins previously acknowledged that he "had reservations" about allowing employees to participate in competitors' fantasy sports games. Robins state, "I, to be honest, did have some reservations about this, and have spoken in the past with some of our competition about whether we should have policies such as this one in place."

26.     Nonetheless, Robins and his counterparts at FanDuel conspired to allow their employees to continue the practice.

27.     Robins and his co-founders, Liberman and Matt Kalish, now admit that DraftKings employees' participation in fantasy sports games is improper. DraftKings now informs its customers, including Plaintiff, that it has enacted policies "prohibiting DraftKings employees from . . . participation in any public daily fantasy sports contests for money," as well as policies prohibiting "employees from any other Daily Fantasy Sports contest operator from participating in games on DraftKings."

28.     Recently, FanDuel similarly announced on its website, "We have permanently banned our employees from playing any daily fantasy games for money, on any site. We will

---

[6]     *See*   https://www.bostonglobe.com/business/2015/10/05/draftkings-bans-employees-from-competitors-sites/s36ig5e0eV0OR9C55R8hwL/story.html (accessed October 11, 2015).

also require all customers to confirm that they are not an employee of any other third party fantasy site, and if they are, they will not be allowed to access our site."

29.     For far too long, however, Defendants concealed the extent to which its employees were successfully utilizing insider information to advance their competitive status. Had Plaintiff and the class known the extent to which games they had entered were populated by Defendant employees with access to relevant, proprietary information, they would not have entered contests on Defendants' websites.  Plaintiff and the Class (defined below) were injured by Defendants' course of fraudulent, misleading, and negligent conduct.

**B.      Plaintiff's Fantasy Sports Play**

30.     Plaintiff has accounts with both DraftKings and FanDuel.  Plaintiff regularly pays entry fees to Defendants to participate in the fantasy sports games operated by Defendants on their websites.  Since May 1, 2015, he has deposited approximately $600 in his DraftKings account and $25 in his FanDuel account.

31.     Plaintiff relied on Defendants' representations that its fantasy sports games are "games of skill."  Plaintiff had no knowledge that Defendants' employees used non-public information to participate in competitors' fantasy sports games with a competitive advantage. Had Plaintiff known that he was participating in these games at a disadvantage to Defendants' employees, he would not have paid entry fees to Defendants or participated in Defendants' fantasy sports games.

**C.      Unconscionable Terms of Use**

**1.      *DraftKings***

32.     Plaintiff and Class Members are presented with Draft Kings' Terms of Use via a hyperlink during the registration process.  No customer can complete the registration process

8

without checking a box indicating agreement to the DraftKings Terms of Use.  Plaintiff and

Class Members were given no opportunity to negotiate the DraftKings Terms of Use.  According

to DraftKings' Terms of Use, its customers are forced to either accept the Terms of Use in their

entirety or reject them and forego using DraftKings' website:

> You agree to these Terms of Use by accessing or using the Website, registering
> for Services offered on the Website, or by accepting, uploading, submitting or
> downloading any information or content from or to the Website. IF YOU DO
> NOT AGREE TO BE BOUND BY ALL OF THESE TERMS OF USE, DO NOT
> USE THE WEBSITE.

33.     As demonstrated below, Plaintiff and Class Members could not have procured

equivalent services from competitors without being required to agree to similarly restrictive

terms of use.

34.     DraftKings has the unilateral ability to modify its Terms of Use, which provide

that "DraftKings reserves the right to amend these Terms of Use at any time and without notice,

and it is your responsibility to review these Terms of Use for any changes. If you continue to use

the Services after we change the Terms of Use, you accept all changes."  Plaintiff and the Class

Members are not empowered to accept or reject any changes to DraftKings' Terms of Use.

35.     "DraftKings reserves the right, in its sole and absolute discretion, to deny any

contestant the ability to participate in head-to-head contests for any reason whatsoever."  It

further "reserve[s] the right to cancel Contests at any time."  In addition, "DraftKings may,

without prior notice, immediately revoke any or all rights granted to you hereunder."  Such a

revocation results in users losing all access to the DraftKings website.

36.     DraftKings' Terms of Use create a contract of adhesion and do not constitute a

valid, mutual agreement.  The Terms of Use employed by DraftKings, including the arbitration,

class-action waiver, and forum selection clauses,[7] are illusory, oppressive, unconscionable, and unenforceable.

37.     Moreover, Plaintiff did not review the Terms of Use before signing up on Defendant's website, and the Terms of Use failed to provide Plaintiff with constructive notice.

### 2.     *FanDuel*

38.     Plaintiff and Class Members are presented with FanDuel's Terms of Use via a hyperlink during the registration process.  Customers are not given the option of rejecting or accepting the Terms of Use.  Plaintiff and Class Members were given no opportunity to negotiate the FanDuel Terms of Use.  They were forced to either accept the Terms of Use in their entirety or else reject them and forego using FanDuel's website.  Plaintiff and Class Members could not have procured equivalent services from competitors without being required to agree to similarly restrictive terms of use.

39.     FanDuel "reserves the right, at its sole discretion, to modify or replace the Terms of Use at any time. The most current version of these Terms will be posted on our Site. You shall be responsible for reviewing and becoming familiar with any such modifications. If a revision to the Terms, in our sole discretion, is material, we will notify you by contacting you through the email address associated with your account. Use of the Services by you after any modification to

---

[7] A review of prior versions of the DraftKings website indicate that the arbitration and class-action waiver clauses were added in September 2014.  *Compare* 9/15/14 Terms of Use, *available at* http://web.archive.org/web/20140915130255/https://www.draftkings.com/help/terms (last visited Oct. 9, 2015), *with* 7/6/14 Terms of Use, *available at* http://web.archive.org/web/20140706001849/https://www.draftkings.com/help/terms (last visited Oct. 9, 2015).

the Terms constitutes your acceptance of the Terms of Use as modified."  Plaintiff and the Class

Members are not empowered to accept or reject any changes to FanDuel's Terms of Use.

40.     FanDuel "reserves that right to cancel contests, in our sole discretion, without any

restrictions."  The Terms of Use further provide that "FanDuel may remove any User Content

and terminate any FanDuel account at any time for any reason."

41.     FanDuel's Terms of Use create a contract of adhesion and do not constitute a

valid, mutual agreement.  The Terms of Use employed by FanDuel, including the arbitration,

class-action waiver, and forum selection clauses added by FanDuel in 2013, [8] are illusory,

oppressive, unconscionable, and unenforceable.

42.     Moreover, Plaintiff did not review the Terms of Use before signing up on

Defendant's websites, and the Terms of Use failed to provide Plaintiff with constructive notice.

## V.     CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a) and

23(b)(3).

44.     Plaintiff seeks certification of the following nationwide classes (the "Class"):

All persons in the United States who deposited money into a DraftKings and/or
FanDuel account on or before October 15, 2015 and competed in any daily
fantasy sports contest where other entries were made by employees from
DraftKings, FanDuel, or any other daily fantasy sports site.

---

[8] *Compare* 11/29/13 Terms of Use, *available at*
http://web.archive.org/web/20131129161640/https://www.fanduel.com/terms (last visited Oct. 9,
2015), *with* 8/14/13 Terms of Use, *available at*
http://web.archive.org/web/20130814150029/https://www.fanduel.com/terms (last visited Oct. 9,
2015).

45.     Excluded from the Class are the Defendants, their parent companies, subsidiaries, and affiliates; any co-conspirators; federal governmental entities and instrumentalities of the federal government; states and their subdivisions, agencies, and instrumentalities; and any judicial officer presiding over this matter and his or her staff.

46.     **Numerosity.** The Class comprises thousands or more of consumers throughout New York. The Class is so numerous that joinder of all members is impracticable.

47.     **Commonality and Predominance.** Common questions of law and fact exist as to Plaintiff and the Class and predominate over any questions that affect only individual Class members. These common questions of law and fact include, without limitation:

(a)     Whether Defendants engaged in a course of fraudulent and deceptive conduct in the daily fantasy sports contests made available on their respective websites;

(b)     Whether Defendants violated the laws of Massachusetts, Florida, and New York by their fraudulent and deceptive course of conduct, as described in this Complaint, in the daily fantasy sports contests made available on their respective websites;

(c)     Whether Defendants' fraudulent and deceptive conduct harmed Plaintiff and the Class;

(d)     Whether Defendants negligently allowed employees with access to non-public information to participate in their daily fantasy sports contests;

(e)     Whether Defendants were unjustly enriched by their deceptive practices The appropriate injunctive and related equitable relief; and

(f)     The appropriate measure of damages sustained by the Plaintiffs and other members of the Class.

48.     **Typicality.** Plaintiff's claims are typical of the claims of Class members. Plaintiff and the Class sustained damages arising out of Defendant's common course of conduct in violation of law, as described herein. The damages of each Class member were caused directly by Defendant's unlawful and deceptive conduct.

49.     **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class because they share common injuries as a result of Defendant's conduct that is common to all Class members. Plaintiff has no interests adverse to the interests of absent Class members. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex class action and consumer protection litigation. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Class, and have the financial resources to do so.

50.     **Superiority.** A class action is superior to other methods of fairly and efficiently adjudicating this litigation.  While not inconsequential, the damages as to any individual litigant are such that individual litigation is not feasible. Furthermore, many Class members may not even be aware that they have claims. Accordingly, for Class members, a class action is the only mechanism by which they could reasonably expect to vindicate their rights.

51.     The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action.

52.     Class treatment of predominating common questions of law and fact is superior to multiple individual actions because it would conserve the resources of the courts and the litigants, and further the efficient adjudication of Class member claims.

53.     Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## VI.     CAUSES OF ACTION

**COUNT ONE**
**Fraud**

54.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

55.     As is fully alleged above, throughout the class period, Defendants made misrepresentations and material omissions of fact which were false and which Defendants knew to be false.  Specifically, Defendants misrepresented that their fantasy sports contests were fair games of skill.  Defendants willfully failed to disclose that their employees, agents, and with access to non-public statistics and other information could use this information, which gives them a significant competitive advantage, to participate in fantasy sports games on competitors' websites and compete against Plaintiff and the Class Members.

56.     Defendants had superior knowledge regarding their employees' access to statistical information and their employees' ability to use that information to gain a competitive advantage in competitors' fantasy sports games.  The knowledge that Defendants' employees and agents were using non-public information to gain a competitive advantage in fantasy sports games was not readily available to Plaintiff and the Class Members.   Failing to disclose this information to Plaintiff and the Class Members rendered Defendants' transactions with Plaintiff and the Class Members inherently unfair.  Defendants therefore had a duty to disclose this information to Plaintiff and the Class Members.

57.      Defendants' misrepresentations and omissions created the illusion that its games were fair games of skill.  Defendants' misrepresentations and omissions were made for the purpose of inducing Plaintiffs and members of Class to join their websites and pay entry fees to Defendants to participate in their fantasy sports games.

58.     Plaintiff   and   the   Class   Members   justifiably   relied   on   Defendants' misrepresentations and omissions when they joined Defendants' websites, payed Defendants' entry fees, and participated in Defendants' fantasy sports games.  Defendants knew, or should have known, that the integrity of the fantasy sports games was a material fact inducing Plaintiff

and the Class Members to pay entry fees and participate.  Plaintiffs and the Class Members would not have payed entry fees and participated in Defendants' fantasy sports games absent Defendants' misrepresentations and omissions regarding the same.

59.     As a result of Defendants' fraudulent misrepresentations and omissions, Plaintiff and the Class Members were induced into transactions that they otherwise would not have made and suffered financial injury, harm, and damages as described in this Complaint.

**COUNT TWO**
**Violation of New York General Business Law § 349**

60.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

61.     Defendants' conduct, including the misrepresentations and omissions described above, was consumer oriented.  Its conduct affected not only Plaintiff but also similarly situated consumers, including the approximately 200,000 monthly active users of DraftKings' website and the approximately 1 million monthly active users of FanDuel's website.

62.     Defendants' conduct, including the misrepresentations and omissions described above, was material misleading.  Defendants' misrepresentations and omissions were likely to mislead a reasonable consumer acting reasonably under the circumstances.

63.     Plaintiffs and the Class Members reasonably relied on Defendants' material misrepresentations and omissions regarding the integrity and fairness of their fantasy sports games.  Plaintiffs and the Class Members would not have paid entry fees and participated in Defendants' fantasy sports games but for its misrepresentations and omissions.

64.     By reason of the foregoing, Defendants' conduct constitutes deceptive acts and practices in violation of General Business Law § 349, and Plaintiff and the Class Members suffered financial injury, harm, and damages as a result thereof.

**COUNT THREE**
**Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA)**

65.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

66.     Defendants' conduct, described more fully above, constitutes a deceptive and unfair trade practice.  Defendants' misrepresentations and omissions regarding the fairness and integrity of their fantasy sports games were likely to mislead a consumer acting reasonably in the circumstances, to the consumer's detriment.

67.     Plaintiff and the Class members relied on Defendant's deceptive conduct to their detriment.  Had Plaintiff and the Class members known that Defendants' employees were able to use non-public information while participating competitors' fantasy sports games, they would not have payed Defendants' entry fees and participated in the same fantasy sports games.

68.     By reason of the foregoing, Defendants' conduct constitutes deceptive and unfair practices in violation of the FDUTPA, and Plaintiff and the Class Members suffered financial injury, harm, and damages as a result thereof.

**COUNT FOUR**
**Violation of Massachusetts Consumer Protection Act (MCPA)**

69.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

70.     Defendants' conduct, described more fully above, constitutes a deceptive and unfair practice.  Defendants' misrepresentations and omissions regarding the fairness and integrity of their fantasy sports games were material to the transaction between Defendants and Plaintiff and the Class Members.

16

71.     Plaintiff and the Class members reasonably relied on Defendants' deceptive conduct to their detriment.  Defendants' conduct, including the misrepresentations and omissions described above, induced Plaintiff and the Class members to pay Defendants' entry fees and participate in Defendants' fantasy sports games.  Had Plaintiff and the Class members known that Defendants' employees were able to use non-public information while participating in competitors' fantasy sports games, they would not have payed Defendants' entry fees and participated in the same fantasy sports games.

72.     By reason of the foregoing, Defendants' conduct constitutes deceptive and unfair practices in violation of the MCPA, and Plaintiff and the Class Members suffered financial injury, harm, and damages as a result thereof.

**COUNT FIVE**
**Negligence**

73.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

74.     Defendants promise in their Terms of Use that their fantasy sports games are "games of skill" and accepted entry fees from Plaintiffs to participate in those games.  According to those same Terms of Use, "winners are determined by the individuals who use their skill and knowledge of relevant professional sports information and fantasy sports rules to accumulate the most fantasy points."

75.     Defendants owed a duty to Plaintiffs and the Class Members to use reasonable care to provide true, reliable, and accurate information regarding the administration of their fantasy sports games.  Defendants also owe a duty to protect the fairness and integrity of the fantasy sports games being operated on their websites.

76.     Defendants breached these duties to Plaintiffs and the Class Member by failing to prevent persons possessing non-public information, by virtue of their employment by other fantasy sports websites, from competing against Plaintiffs and the Class Members.  Defendants further breached these duties by allowing its employees to participate in fantasy sports games on competitors' websites.   Defendants failed to use reasonable care in communicating the information about safety and security of data, employee access to data, and ability of employees to use material non-public data to compete against Plaintiff and the Class Members on other websites, or allow employees of other companies with material non-public access to compete on the websites where Plaintiffs and the Class Members competed.

77.     As a direct and proximate result of Defendants' negligence, Defendants' significantly and materially decreased Plaintiff's and the Class Members' ability to use their skills to win the fantasy sports games they entered, and Plaintiff and the Class Members suffered financial injury, harm, and damages.

## COUNT SIX
## Unjust Enrichment

78.     Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

79.     Defendants have benefitted and been enriched from their unlawful acts by accepting the benefit conferred by Plaintiff and the Class Members.

80.     It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the entry fees paid by Plaintiff and the Class Members to participate in Defendants' fantasy sports games.

81.     Defendants' ill-gotten gains were at the expense of Plaintiff and the Class Members through their payment of entry fees to participate in Defendants' fantasy sports games.

82.     It is against equity and good conscience to permit Defendants to retain their ill-gotten profits.

### PRAYER FOR RELIEF

Plaintiff, individually and on behalf of the Class, prays for judgment and relief against Defendant as follows:

A.      For an order certifying this case as a class action and appointing Plaintiff and Plaintiff's counsel to represent the Class;

B.      For a declaratory judgment and injunction prohibiting the use of non-public information while participating in fantasy sports games on Defendants' websites;

C.      For an order awarding, as appropriate, damages, restitution, and/or disgorgement to Plaintiff and the Class Members, including all damages to which Plaintiff and the Class are entitled to under New York, Massachusetts, and Florida law, including General Business Law § 349(h), the FDUTPA, and the MCPA, and all other statutory penalties.

D.      For an order awarding attorneys' fees and costs to which Plaintiff and the Class are entitled to under New York, Florida, and Massachusetts law, including General Business Law § 349(h), the FDUTPA, and the MCPA;

E.      For an order awarding punitive damages;

F.      For an order awarding pre-judgment and post-judgment interest; and

G.      For an order providing such further relief as this Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 15, 2015.           Respectfully submitted,

                                   CUNEO GILBERT & LADUCA, LLP

                                   *s/ Taylor Asen*

                                   Taylor Asen
                                   (New York Bar Number: 5101738)
                                   CUNEO GILBERT & LADUCA, LLP
                                   16 Court Street, Suite 1012
                                   Brooklyn, NY 11241
                                   Telephone:  202-789-3960
                                   Facsimile:  202-589-1813
                                   E-mail:      tasen@cuneolaw.com

                                   Charles J. LaDuca
                                   Katherine Van Dyck
                                   CUNEO GILBERT & LADUCA, LLP
                                   507 C Street NE
                                   Washington, DC 20002
                                   Telephone:  (202) 789-3960
                                   Facsimile:  (202) 789-1813
                                   E-mail:      charles@cuneolaw.com
                                   E-mail:      kvandyck@cuneolaw.com

                                   Michael J. Flannery
                                   Cuneo Gilbert & LaDuca, LLP
                                   7733 Forsyth Boulevard
                                   Suite 1675
                                   St. Louis, MO  63105
                                   Telephone:  (314) 226-1015
                                   Facsimile:  (202) 789-1813
                                   E-mail:      mflannery@cuneolaw.com

                                   Robert K. Shelquist
                                   LOCKRIDGE GRINDAL NAUEN, PLLP
                                   100 Washington Avenue South
                                   Suite 2200
                                   Minneapolis, MN  55401
                                   Telephone:  (612) 339-6900
                                   Facsimile:  (612) 339-0981
                                   E-mail:  rkshelquist@locklaw.com

                                   ***Attorneys for Plaintiff***